UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

GALBRAITH LABORATORIES, INC.                                                                                    PLAINTIFF

v.                                                                                        CIVIL ACTION NO. 3:15-CV-00553-CRS

NANOCHEM SOLUTIONS INC., AND
FLEXIBLE SOLUTIONS INTERNATIONAL, INC.                                                               DEFENDANTS

Memorandum Opinion

I.  Introduction

Galbraith Laboratories, Inc. ("Galbraith") filed this lawsuit against Flexible Solutions International, Inc. ("Flexible Solutions") and Nanochem Solutions Inc. ("Nanochem"), (collectively, the "Defendants").

The Defendants move for partial dismissal of Galbraith's claims under a recent Supreme Court ruling.  *See Kimble v. Marvel Entm't LLC*, 135 S.Ct. 2401 (2015).  Galbraith moves for leave to file a sur-reply.

For the reasons below, the Court will grant the Defendants' partial motion to dismiss. The Court will grant Galbraith's motion for leave to file a sur-reply.

II.  Legal standard

In evaluating a motion to dismiss for failure to state a claim, the Court determines whether the complaint alleges "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  This Court assumes the veracity of well-pleaded factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The complaint "does not need detailed factual allegations," but a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

III.     The complaint

The Court assumes the veracity of the following well-pleaded factual allegations in Galbraith's complaint and attached documents:

In May 1992, Galbraith and Donlar Corporation ("Donlar") entered into a Joint Development Agreement ("JDA") in which they "agreed to jointly develop agricultural products containing polyaspartic acid," Compl. ¶ 6, ECF No. 1. Donlar and Galbraith also established the terms and conditions under which the companies would establish a joint venture company. *Id.* Under the JDA, Galbraith and Donlar jointly owned a patent application that eventually became U.S. Patent No. 5,350,735 (the "735 Patent"). *Id.*; *see also*, JDA (2)(C)(2)(b), ECF No. 8-1.

In June 1994, Galbraith and Donlar entered into the Technology Assignment Agreement ("TAA"), which superseded the JDA. Compl. ¶¶ 7, 9; *see also*, TAA, ECF No. 8-2.[1] Under the "Grant of Rights" article of the TAA, Galbraith assigned Donlar its rights in

> the subject matter disclosed in U.S. Patent Application Serial No. 07/972,375, filed November 5, 1992, entitled Composition and Methods for Enhanced Fertilizer Uptake by Plants, including worldwide patent rights in such subject matter; and inventions and discoveries, whether patentable or not, that (1) use or include polymers of polyaspartic acid, copolymers and compositions containing polymers of polyaspartic acid, or polysuccinimide; and (2) were conceived during the JDA by Galbraith or Donlar or both, as evidenced by written documents, and Donlar hereby accepts such assignment.

TAA 1. U.S. Patent Application Serial No. 07/972,375 became the 735 Patent. *See* Compl. ¶¶ 6, 8.[2]

---

[1] The TAA says, "Effective as of the date of the JDA (May 8, 1992), the parties agree to cancel the JDA [] in its entirety and release the other party from any further obligations under that Agreement. Except as stated herein, neither party will assert any rights based on the JDA, and all rights and obligations arising under the JDA are cancelled." TAA 2.

[2] Although Galbraith did not attach a copy of the 735 Patent to its complaint or the supporting exhibits, the parties agree that Patent Application No. 07/972/375 became the 735 Patent. Defs.' Mot. Partial Dism'l 2, ECF No. 15-1; Compl. ¶ 8.

2

Under the "Compensation" article of the TAA, Donlar agreed to pay Galbraith $300,000. TAA 2. Donlar agreed to secure this obligation with Patent 735 as collateral. *Id.* at 2 – 4. Donlar agreed to convey 70,000 shares of stock to Galbraith. *Id.* at 5. Donlar also agreed to pay Galbraith royalties on the sale of Licensed Products. The TAA defined "Licensed Products" as

> (1) any product covered by patents that issue on the above referenced patent application (including continuation, continuation in part, and divisional applications) and (2) any product sold in the agricultural market for agricultural purposes that uses or includes polymers of polyaspartic acid, copolymers and compositions containing polymers of polyaspartic acid, or polysuccinimide.

*Id.* Donlar's obligation to pay royalties began after the earlier of sales equaling $5 million or after 5 years, not to exceed $7.5 million. Compl. ¶ 9; TAA 5.

In 2004, Donlar filed for Chapter 11 bankruptcy. Compl. ¶ 10. The bankruptcy court entered an order approving an Asset Purchase Agreement between Donlar and Flexible Solutions. *Id.*; *see also*, *In Re: Donlar Corp.* Order, ECF No. 8-3. Under the Asset Purchase Agreement, Donlar assigned and Flexible Solutions assumed the TAA. Compl. ¶ 10.

Nanochem, a wholly owned subsidiary of Flexible Solutions, made royalty payments from 2004 until the first quarter of 2014. *Id.* ¶ 12. In June 2014, Nanochem requested Galbraith refund the sum of $132,947.70 "based on the assertion that Defendants' obligation to make royalty payments pursuant to the TAA ceased upon expiration of the []735 Patent on November 5, 2012." *Id.* ¶ 13.[3] The parties agree that the 735 Patent expired on November 5, 2012. Defs.' Mem. Supp. Mot. Dismiss 3; Pl.'s Resp. Opp. Mot. Dismiss 4, ECF No. 17.

IV. <u>The Defendants' partial motion to dismiss</u>

---

[3] Nanochem sued Galbraith in the U.S. District Court for the Northern District of Illinois to recover the alleged overpayment of $132,947.70. Compl. ¶ 15. Galbraith filed this action six months later seeking to recover additional royalties. Defs.' Mem. Supp. Mot. Dismiss 3, ECF No. 15-1. The U.S. District Court for the North District of Illinois dismissed that action. Defs.' Mem. Supp. Mot. Ext. Time 2, ECF No. 14-1.

3

The Defendants move for partial dismissal of Galbraith's complaint, based on the Supreme Court's decisions in *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401 (2015) and *Brulotte v. Thys Co.*, 379 U.S. 29 (1964).

In 1964, the Supreme Court held that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se." 379 U.S. at 32. The Court reasoned, "A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly. But to use that leverage to protect those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent by tieing (sic) the sale or use of the patented article to the purchase or use of unpatented ones." *Id.* at 33.

In 2015, the Supreme Court revisited the rule in *Brulotte*. The Court declined to overrule *Brulotte*, explaining: "The decision is simplicity itself to apply. A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Kimble*, 135 S.Ct. at 2411.

The Defendants argue that *Brulotte* and *Kimble* require dismissal of "all elements of Counts I – V of the Complaint (DN1) to the extent that they relate to royalties accruing after expiration of the []735 Patent, and seeks to completely dismiss Count VI which pertains only to future royalties." Defs.' Mot. Partial Dism'l 1, ECF No. 15.

Galbraith argues that *Brulotte* and *Kimble* do not apply because the royalty payments in the TAA are tied to non-patent rights. Galbraith relies on an exception to *Brulotte* highlighted in *Kimble*: "post-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent." *Kimble*, 135 S. Ct. at 2408. As part of this "non-patent right" argument, Galbraith argues that the "royalty payments at issue are compensation for cancelling

4

Galbraith's half-interest share in the joint venture company to be formed pursuant to the JDA."

Pl.'s Resp. 8 (citing Compl. ¶ 9).

The Technology Assignment Agreement says:

2. COMPENSATION. ...

       2.3 Royalties. Beginning upon the earlier of (i) five years following the Effective Date of this Agreement or (ii) when sales of Licensed Products by Donlar and its Licensees equals Five Million ($5,000,000) (the "Royalty Initiation Date"), Donlar shall pay Galbraith a royalty on its sales of Licensed Products and Licensing Revenue, as set forth in the table below. "Licensed Products" shall mean (1) *any products covered by patents that issue on the above referenced patent application* (including continuation, continuation in part, and divisional applications) and (2) any product sold in the agricultural market for agricultural purposes that uses or includes polymers of polyaspartic acid, copolymers and compositions containing polymers of polyaspartic acid, or polysuccinimide. "Licensing Revenue" shall mean all monies or other benefit derived by Donlar from licensing unrelated third parties, to make, have made, use or sell Licensed Products. ...

| Royalty Rate on Licensing Revenue | Royalty Rate on Sales of Licensed Products | Paid Until Cumulative Royalties From Sales and Licensing Equal |
|---|---|---|
| 40% | 4% | $2 million |
| 30% | 3% | $4 million |
| 25% | 2% | $6 million |
| 20% | 1% | $7 ½ million |

At such time as the cumulative royalties paid by Donlar to Galbraith hereunder equal Seven Million Five Hundred Thousand Dollars ($7,500,000), Donlar's royalty obligation shall terminate and no further royalties shall be due hereunder.

TAA 6 (emphasis added).

Although Galbraith argues that "it is clear that the royalty obligations of the TAA were intentionally separated from the price assigned to the patent rights," this argument is unpersuasive. The TAA's definition of "Licensed Products" explicitly says that Donlar will pay Galbraith royalties for the sale of Licensed Products on "any products covered by patents that issue on the above referenced patent application." TAA 5. The "above referenced patent application" is the U.S. Patent Application Serial No. 07/972,375, *see* TAA 1, which the parties

agree became the 735 Patent. Compl. ¶ 6; Def.'s Mem. 2. Thus, the TAA's royalties provision obligated Donlar to pay Galbraith royalties for the sale of products covered by the 735 Patent. Ultimately, the TAA intertwined Donlar's obligation to pay royalties with Galbraith's patent rights, and the TAA did not intentionally separate royalties from patent rights.

Galbraith's argument that the royalties were consideration for cancelling the JDA is likewise unavailing. The TAA explicitly says that Donlar terminated the JDA by a letter postmarked July 26, 1993, *see* TAA 2, almost one year before Galbraith and Donlar entered into the TAA. TAA 1. Section 2.1 of the TAA "License Fees" begins with "As consideration for the assignment set forth above," which Galbraith relies on to argue that the $300,000 payment was consideration for the patent licensing, and the royalties provisions served as consideration for cancelling Galbraith's half-interest share. *See* Pl.'s Resp. 8.

However, "License Fees" falls under the larger Article entitled "Compensation," indicating that the License Fees were part of Donlar's larger obligation to convey 70,000 shares of stock to Galbraith, pay Galbraith royalties for the sale of Licensed Products, report on its sale of Licensed Products, pay any applicable minimum royalties, and submit to an audit by Galbraith. *See* TAA 2 – 8. Galbraith's argument artificially parses the "Compensation" article of the TAA which included inter-related and mutually enforceable terms for payment of patent licensing and cancelling Galbraith's half-interest share.

Further, although the Court in *Kimble* said, "post-expiration royalties are allowable so long as tied to a non-patent right," Justice Kagan explained this exception in the next sentence of the opinion: "That means, for example, that a license involving both a patent and a trade secret can set a 5% royalty during the patent period (as compensation for the two combined) and a 4% royalty afterward (as payment for the trade secret alone)." 135 S.Ct. at 2408. Here, the TAA has

no provision differentiating the calculation of royalties during the patent period and a calculation of royalties after the patent expired. *See id.* Additionally, as in *Kimble*, the TAA has no expiration date for the payment of royalties. *See id.* at 2406 ("The parties set no end date for royalties, apparently contemplating that they would continue for as long as kids want to imitate Spider-Man (by doing whatever a spider can).").

Finally, Galbraith's argument that the royalty payments were not subject to patent leverage is without merit. Galbraith points to the court of appeals opinion in *Kimble*: "Accordingly, we join our sister circuits in holding that a so-called 'hybrid' licensing agreement encompassing inseparable patent and non-patent rights is unenforceable beyond the expiration date of the underlying patent, unless the agreement provides a discounted rate for the non-patent rights or some other clear indication that the royalty at issue was in no way subject to patent leverage." Pl.'s Resp. 9 – 10 (quoting *Kimble v. Marvel Enters. Inc.*, 727 F.3d 856, 857 (2013)). Galbraith has made no showing that the TAA clearly indicated that the royalties were "in no way subject to patent leverage." *Id.*

The Court concludes that the TAA provides royalties for the post-expiration use of Patent 735. *See Kimble*, 135 S.Ct. at 2411. [4] Under *Kimble* and *Brulotte*, the post-expiration royalties are unlawful per se. The Court will grant the Defendants' partial motion to dismiss to the extent

---

[4] The complaint identifies Donlar patents to which Galbraith shared an ownership interest under the JDA as "including, without limitation, U.S. Patent Nos. 5,661,103; 5,854,177; 5,814,582; 5,861,356; 5,783,523; and 5,935,909." Compl. ¶ 14. In its response, Galbraith argues that this paragraph is sufficient to put the Defendants on notice that the TAA covers additional patents with later expiration dates than Patent 735, including U.S. Patent Nos. 5,635,447 and 5,646,133. Pl.'s Resp. 13 – 14.

However, Galbraith admits that "a patent had not been applied for with respect to these ideas by the time the TAA was entered into," and that Patent '477 and Patent '133 were "not specifically identified in the complaint." Pl.'s Mem. 13. Galbraith makes no allegation that Patent '477 or Patent '133 issued as a result of U.S. Patent Application Serial No. 07/972,375, or that the royalties provision of the TAA otherwise applies to these later-issued patents.

7

that Galbraith's claims seek payment of royalties on an expired patent. The Court will dismiss Count VI in full, as it seeks recovery for royalties on an expired patent.

      V.      <u>Galbraith's motion for leave to file a sur-reply</u>

Galbraith moved for leave to file a sur-reply. Pl.'s Mot. 1, ECF No. 22. The Defendants opposed this motion. Defs.' Resp. Opp. 1, ECF No. 24. Galbraith then filed a "Reply in Support of Motion for Leave to File Sur-Reply to Defendants' Reply in Support of Motion for Partial Dismissal Under Rule 12(b)(6)." Pl.'s Reply 1, ECF No. 25.

Whether to grant leave to file a sur-reply is in within the Court's discretion. *Key v. Shelby Cty.*, 551 F.App'x 262, 264 (6th Cir. 2014).

The Court will grant Galbraith's motion for leave to file a sur-reply.

In its response brief, Galbraith requested that the Court grant leave to amend the complaint to correct any deficiencies the Court may find. Pl.'s Mem. 14. Galbraith did not move to amend, file a memorandum in support, or tender a proposed amended complaint for the Court's review. The Court will not consider Galbraith's unsupported request at this time.

      VI.      <u>Conclusion</u>

The Court will dismiss Counts I-V to the extent that those claims relate to royalties accruing after expiration of the 735 Patent, with prejudice. The Court will dismiss Count VI, with prejudice. The Court will grant Galbraith's motion for leave to file a sur-reply. The Court will enter an order in accordance with this opinion.

April 8, 2016



                            **Charles R. Simpson III, Senior Judge**
                            **United States District Court**